Daniel Riggs #1112164

Bryan Harmer #1188110
Name and Inmate Booking Number

Lovelock Correctional Center
Place of Confinement

1200 Prison Road
Mailing Address

Lovelock, NV 89419
City, State, Zip Code

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Daniel Riggs

Bryan Harmer
                                    Plaintiffs,

vs.

(1) Scott Davis, et al.,

(2) See additional pages,

(3) for defendants,

(4) _____,

(5) _____,
                    --Defendant(s).

Case No. _____
(To be supplied by Clerk of Court)

### CIVIL RIGHTS COMPLAINT
### BY AN INMATE

☑ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

☑ Jury Trial Demanded

### A.    JURISDICTION

1)  This Court has jurisdiction over this action pursuant to:
    ☑ 28 U.S.C. § 1343(a)(3); 42 U.S.C. § 1983; 42 U.S.C. ¢ 1985(3)
    ☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Named Agents, 403 U.S. 388 (19
    ☑ Other: 42 U.S.C. ¢ 2000 cc (RLUIPA)

2)  Institution/city where Plaintiff currently resides: Lovelock Correctional

3)  Institution/city where violation(s) occurred: LCC

## B.    DEFENDANTS

4) Name of first Defendant: _Scott Davis_ . The first Defendant is employed as:
_Chaplain_ at _LCC_ .
  (Position of Title)                              (Institution)

5) Name of second Defendant: _Kara LeGrand_ . The second Defendant is employed as:
_Associate Warden of Programs (AWP)_ at _LCC_ .
  (Position of Title)                              (Institution)

6) Name of third Defendant: _James Dzurenda_ . The third Defendant is employed as:
_Director_ at _Nevada Department of Corrections (NDOC)_.
  (Position of Title)                              (Institution)

7) Name of fourth Defendant: _Charles Daniels_ . The fourth Defendant is employed as:
_former Director_ at _NDOC_ .
  (Position of Title)                              (Institution)

8) Name of fifth Defendant: _Tim Garrett_ . The fifth Defendant is employed as:
_former warden_ at _LCC_ .
  (Position of Title)                              (Institution)

9) The sixth Defendant is Nethanjah Breitenbach. Breitenbach is the warden at LCC.

10) The seventh Defendant is known to Plaintiffs as Ms. Ellis (the first names of prison officials are often unknown to inmates). Ellis is the food-service manager at LCC.

11) The eighth Defendant is known to Plaintiffs as Lt. Preston. Preston is a Lieutenant at LCC.

12) The ninth Defendant is known to Plaintiffs as Lt. Clark. Clark is a Lieutenant at LCC.

13)    The tenth Defendant is known to Plaintiffs as
Lt. Harroun. Harroun is a Lieutenant Defendant at LCC.

14) The eleventh Defendant is known to Plaintiffs as
Sgt. Martin. Martin is a sergeant at LCC.

15) The twelfth Defendant is known to Plaintiffs as
Sgt. Gentry. Gentry is a sergeant at LCC.

16) The thirteenth Defendant is known to Plaintiffs as
SC/O Govea. Govea is a senior correctional officer at LCC

17) The fourteenth Defendant is known to Plaintiffs as SC/O
Etcheberry. Etcheberry is a senior correctional officer at LCC.

18) The fifteenth Defendant is known to Plaintiffs as SC/O
Wilcoxen. Wilcoxen is a senior correctional officer at LCC

19) The sixteenth Defendant is known to Plaintiffs as SC/O
Hensley. Hensley is a senior correctional officer at LCC.

20) The seventeenth Defendant is known to Plaintiffs as
C/O Martinez. Martinez is a former correctional officer at LCC.

21) The eighteenth through twenty-third Defendants are
Does 1-5. These Does are former and/or current
deputy directors of the NDOC.

3.

22) The first un-indicted co-conspirator is Renee Baker. Baker is the former warden of LCC.

23) The second un-indicted co-conspirator is Tara Carpenter. Carpenter is the former AW/P of LCC.

24) Each and every Defendant named herein acted under color of law and is sued in both their official and personal capacities. Furthermore, each and every Defendant named herein is sued under joint and several liability.

## C. DEFINITIONS

25) For purposes of brevity, the following terms are defined as follows for purposes of this complaint:

26) "Catholic" refers to the Roman Catholic Church and/or describes individuals, including Plaintiff Riggs, who are members of the Roman Catholic Church.

27) "LDS" refers to the Church of Jesus Christ of Latter-Day Saints and/or describes individuals, including Plaintiff Harmer, who are members of the Church of Jesus Christ of Latter-Day Saints

28) "Shadow Government" refers to an organization

4

formed by all un-indicted co-conspirators and De-
fendants named in this Complaint, except for Ellis.
This organization was formed to operate outside official
and legal channels to impose upon Plaintiffs and sim-
ilarly-situated Catholic and/or LDS inmates illegal
and unconstitutional conditions of confinement, as alleged
throughout this Complaint.

29) The Shadow Government members have positions within
the organization which are defined as follows:

30) "Boss" is the head of the Shadow organ Government. De-
fendant Drumenda is the Shadow Government Boss. It is
the Boss who establishes illegal and/or unconstitutional
policies to be implemented within the NDOC and/or
LCC for the benefit of the organization. The Boss
also promotes other Shadow Government members to
better positions within the NDOC as a reward for
completing Shadow Government objectives and retains
shadow Government employees who would otherwise
be terminated from employment in the NDOC
due to misconduct. The Boss also interacts
with legitimate governmental interests to corrupt the
same and to corrupt other related organizations
that are otherwise acting lawfully.

31) "Advisors and counselors" are high-ranking NDOC

5.

Officials, advise and counsel the Boss regarding Shadow
Government objectives and facilitate the carrying-out
of Shadow Government directives. Doe Defendants 1-5,
while employed as NDOC deputy directors, were and/or
are the Advisors or Counselors. These Advisors and
Counselors advised and facilitated the implementation
of illegal and/or unconstitutional measures and objectives
to the extent of corrupting the NDOC. by running
it. These Advisors and Counselors oversaw the imple-
mentation of the civil rights violations as alleged
in this Complaint, and provided Shadow Govern-
ment directives to the "Sub-Bosses" and "Lieutenants",
as defined below.

32) "Sub-Boss" is the person who oversees Shadow Gov-
ernment directives at LCC. This person is usually
the warden at LCC and is promoted to that post
to manage the Shadow Government at LCC. The first
Sub-Boss known to Plaintiffs was Renee Baker,
who wrongfully ousted the former Chaplain (before
Davis), hired Davis and initiated the still-continuing
civil rights violations alleged in this Complaint.
Tim Garrett later became warden at LCC and
assumed the role of Sub-Boss. As Sub-Boss,
Garrett continued to advance the Shadow
Government directives as implemented at LCC
by Baker. Presently Breitenbach is the Sub-Boss

6.

and continues to advance the Shadow Government directives.
The primary function of the Sub-Boss is to ensure that
the Shadow Government "Lieutenants" and "Sub-lieutenants"
as defined below, can and do carry out Shadow Government
directives without hindrance.

33) "Lieutenant" within the Shadow Government refers
to the person primarily tasked with carrying out the day-
to-day directives of the Shadow Government. This per-
son is usually employed as the AW/P. Tara Carpenter
was the first Shadow Government Lieutenant at
LCC known to Plaintiffs. Carpenter, in that role,
assisted Baker in wrongfully ousting the former chaplain
(before Davis) and implemented, acting in her
corrupted role as AW/P, the still-continuing civil
rights violations alleged in this Complaint. Le Grand
succeeded Carpenter in both the corrupted position
of AW/P at LCC and the role of Lieutenant
in the Shadow Government — and has there-
after and still implements and advances the civil
rights violations as alleged in this Complaint.

34) "Sub-Lieutenant" is the right-hand man of the
Lieutenant in the Shadow Government. Scott
Davis is the Sub-Lieutenant of the Shadow
Government. Davis was hired as Chaplain of LCC
specifically to corrupt that position and act

7.

as a Sub-Lieutenant; Davis had actual knowledge that the former Chaplain was ousted for refusing to join the Shadow Government. As Sub-Lieutenant, Davis utilized his now-corrupted position as Chaplain to implement and carry out Shadow Government directives under the supervison of, and in concert, with the Shadow Government Lieutenant, and continues to do so presently.

35) "Henchmen" in the Shadow Government refer to uniformed officers at LCC who intimidate and harass Plaintiffs and others to chill the exercise of First Amendment rights — the exercise of which is counter to the Shadow Government's Objectives. Shadow Government Sub-Bosses and Lieutenants issue directives to the Henchmen. Baker and Carpenter, in these roles, used Henchmen, to inter alia, to oust the former chaplain. The Henchmen known to Plaintiffs at LCC are: Lts. Preston, Clark and Harroun; Sgts. Martin and Gentry; SC/Os Govea, Etcheberry, Wilcoxen and Hensley; and former-C/O Martinez. These Henchmen acting under color of law, utilize and corrupt their positions within the NDOC to target individuals that are singled out by their Shadow Government superiors. The Henchmen named herein caused Catholic inmates including Plaintiff Riggs to be harassed and intimidated when entering the chapel at LCC, and continue to do so presently.

9

## D.    NATURE OF THE CASE

36) This is a civil rights complaint pursuant to 42 U.S.C. s 1983 etc., brought by two inmates at LCC, Daniel Riggs and Bryan Haimer. The crux of this action is that the Defendants have and continue to violate Plaintiffs' rights regarding their religious practices and that the Defendants (except Ellis) conspired to do so.

## E. FACTS COMMON TO ALL CLAIMS (FCACs)

37) Plaintiffs are aware of at least two other civil rights complaints that were brought before this Court by LCC inmates against at least some of the same Defendants named in the instant complaint that also pertain to religious practices: Shaw, et al. v Davis, et al, case no. 3:18-cv-00551-mmD-CZB and Elmajzoub v Davis, et al, case no. 3:19-cv-00196-mmD-CSD. By and large, the same defendants in those cases violated the same civil rights of those plaintiffs at the same time and in the same way as Defendants' have and continue to violate Plaintiffs' civil rights as alleged in the instant Complaint. However, the Defendants' violations in the instant case exceed those in the prior cases and are still continuing presently.

///

38) Plaintiff Riggs is a practicing Catholic. In 2014 Riggs was baptized into the Catholic Church at the chapel at LCC by Catholic clergy who came to LCC to celebrate mass on Pentecost Sunday; this was done under the supervision of LCC's then-chaplain (Davis's predecessor). That chaplain later made Riggs a Catholic facilitator (facilitators help organize and conduct chapel services at LCC; they are appointed by the chaplain); as such, Riggs facil-itated the Catholic RCIA service (a weekly religious study service similar to a Bible study and necessary for adults who seek to be baptized into the Catholic Church).

39) Shortly after Davis became chaplain, Riggs dis-cussed certain needs of the Catholic faith group with Davis. Davis thereafter revoked Riggs' position as facilitator. Riggs still informally helps organize Catholic services and provide RCIA instruction to other inmates.

40) Plaintiff Harmer has been at LCC since 2019 and is currently the LDS facilitator at LCC, by Davis's fiat. Harmer is a life-long LDS adherant.

41) Both Plaintiffs bring this instant action in their personal capacities and on behalf of other similarly-situated inmates - i.e, Catholic and LDS inmates, at Lovelock Correctional Center, and those wanting to join either church.

## CAUSES OF ACTION

### CLAIM 1

42) All prior paragraphs are hereby incorporated by reference.

43) Defendants violated and continue to violate Plaintiffs' federal civil rights as guaranteed by 42 U.S.C. s 2000 cc (RLUIPA).

44) These violations began in 2018 and are continuing presently.

45) Prior to 2018, Plaintiffs, and similarly situated inmates at LCC were permitted to access a variety of religious services at LCC's chapel, which was open to inmates seven days a week.

46) Catholic services included, but were not limited to: Sunday Mass, Rite of Christian Initiation of Adults (RCIA), Choir Practice, daily morning Rosary (Sunday-Friday), Catholic history class, Confessions, and masses on the Holy Days of the Octave of Christmas (Jan. 1st), the Epiphany (Jan. 06th), Ash Wednesday (date varies), Good Friday (date varies), the Assumption of the Virgin Mary (Aug. 15th), All Saints Day (Nov. 1st), Immaculate Conception Dec. 8th, Christmas (Dec. 25th), and the Ascension of Jesus (date varies). Holy Days that necessarily fall on Sunday, like Easter and Pentecost, were celebrated in the chapel during Sunday mass.

11.

47)  LDS services included but were not limited
to Sunday Sacrament service, Monday Family Service,
bible study, and choir practice.

48) Beginning in or around 2013, Defendants, Drumenda, including but not limited to,
LeGrand and Davis, and un-indicted co-conspirators
Renee Baker and Tara Carpenter, and others
cancelled all Catholic and LDS services other
than the primary Sunday service (Catholic mass and
LDS Sacrament services respectively).

49) Around that same time, Defendants, and others,
cancelled various chapel services for other faith groups similar
at LCC, including, but not limited to, the Episcopalian
faith group and The Way faith group, prompting a
law suit to be brought before this Court, case
no. 3:18-cv-00551-mmD-CLB (hereinafter "Episco-
palian Case"), and the muslim/Islamic faith group, prompting
a separate lawsuit before this Court, case no. 3:19-
cv-00196-mmD-CSD (hereinafter "Muslim Case"). Plaintiffs
move this Court to take judicial notice of both cases.

50) Upon information and belief, prior to being employed
by the NDOC, Defendant LeGrand was a practicing
attorney licensed in Nevada and employed by the
Office of the Attorney General of the State of
Nevada (A.G.O.).

51) Upon information and belief, Defendant LeGrand still holds her license to practice law in Nevada including but not limited to,

52) Defendants, LeGrand and Davis, and others, were found by this Court to have violated RLUIPA in the Episcopalian and Muslim cases — in each case by way of summary judgment, on similar facts of the present cases in the Episcopalian case

53) Upon information and belief, the plaintiffs received in a settlement, that was stated on the record, a cash sum of $75,000.00, and various non-monetary considerations, including having their services on their chosen day and time of the week (Tuesday evenings), and time slots in the chapel for their "Preacher-In-Training" (similar to RCIA or bible study) and choir practice; The Way faith group also received multiple chapel time slots, including slots for study and for choir practice; and the Muslim/Islamic faith group received various non-monetary considerations, including Juma services on Friday afternoons (the specific day and time prescribed by Islamic doctrine) and about $150,000.00 in attorney fees.

54) Plaintiffs anticipated that Defendants would restore Sunday services (which were cancelled in 2020, as articulated in detail below), time slots for religious instruction (Catholic RCIA and IDS bible study,

respectively) and choir practice for both the Catholic and LDS faith groups — even these three time slots would fail to satisfy Plaintiffs' constitutional and statutory federal civil rights, but the restoration of those three services would have been a step in the right direction.

55) In or around 2019, Defendants, including but not limited to, Davis and LeGrand established a bible college at LCC that specifically teaches the doctrines of the Independent Baptist Church — a Protestant church that is expressly hostile to the LDS and the Catholic Churches. Upon information and belief, Defendant Davis received his religious education from the same college — and the college is not accredited by Standard Norms.

56) Defendants, including but not limited to, Davis and LeGrand reappropriated chapel time slots taken from other faith groups, including Catholic and LDS, to hold bible college classes in the chapel — those classes were then taught by Davis.

57) In or around June of 2020, Defendants, including but not limited to, Daniels, Garrett, LeGrand and Davis cancelled all religious services at LCC and closed the chapel.

58) Upon information and belief, Defendants, including but not limited to, Davis and LeGrand continued to facilitate and operate the bible college after June of 2020.

59) At or around December of 2020, Davis, with the approval and assistance of other Defendants, including but not limited to, Garrett and LeGrand, recorded a series of religious sermons from the LCC chapel — with Davis giving the sermons. Those sermons were then played on a loop on a closed-circuit television channel accessable to the inmate population at LCC.

60) At that same time, LCC had a closed-circuit "movie channel" that played DVDs of various movies on a loop, with the DVDs being exchanged with new DVDs on a weekly basis.

61) Meanwhile, a plethora of Catholic and LDS instructional videos DVDs, that had previously been donated to LCC, sat in the chapel unused. Rather than include Catholic and/or LDS DVDs on the closed-circuit channel dedicated to Davis's sermons, Defendants, including but not limited to, Davis and LeGrand chose to only play the videos of Davis's sermons, despite having the means to play a variety of

15.

religious videos from all faith groups.

62) In or around August of 2024, LCC began to allow religious meetings to take place in "activity rooms" of individual housing units. LCC has several "housing units," each of which has 84 cells and thus 168 beds. At the side of each housing unit is an open area called the "activity room." Despite the name, inmates are not allowed access to the activity rooms except in certain circumstances. Depending on the housing unit, the activity room may or may not have a table and/or chairs.

63) The religious meetings in the activity rooms were restricted to inmates in any given housing unit — thus, Plaintiff Riggs could not meet in the activity room with Catholic inmates assigned to other housing units; nor could Plaintiff Horner meet with other LDS inmates in other units.

64) Furthermore, outside clergy from either Church were not allowed into LCC at this time. The Catholic meetings could not rightly be called Mass, nor could the LDS meetings be called a sacramental service. Plaintiff Riggs had no access to receive Holy Communion, nor to confess his sins to a Catholic Priest, nor to any other Catholic sacraments.

16.

65) Plaintiff Harmer had no access to receive a priestly blessing from LDS clergy, receive religious counseling and instruction from an LDS bishop, nor participate in any LDS church practices or saccaments. For all practical purposes, Plaintiffs had no church services.

66) On or around February of 2022, Defendants, including but not limited to, Drivenda, Garrett, LeGrand and Davis, re-opened the LCC chapel. Upon information and belief, this was only due to litigation in the Episcopalian and/or Muslim cases. Originally, only one housing unit was allowed into the chapel at a time, and inmates had to be declared members of that one specific faith group. i.e. Plaintiff Riggs could only go to the Catholic service, and he could not invite his dear friend, Plaintiff Harmer, to the Catholic service, nor could Plaintiff Riggs attend the LDS service with Plaintiff Harmer, etc.

67) Furthermore, Defendants, including but not limited to, Drvienda, Garrett, LeGrand and Davis created a new chapel schedule at that time: Catholic Mass only on Thursday afternoons, and LDS service only on Monday nights — despite having actual knowledge that it is a fundamental tenant of both the Catholic and LDS faiths to specifically attend Church on Sundays — indeed, it is a Holy Obligation for both Plaintiff Riggs and Harmer to do so.

68) Meanwhile, at the same time, Defendants created several time slots for various Protestant services, study groups, choir practices (music), and multiple time slots for students at Davis's bible college to come to the chapel to do coursework, done on a laptop — a privilege not extended to Catholics or LDS inmates.

69) At or around that same time, the Episcopalian (protestant) faith group was given Tuesday night for their services (the same time slot as pre-2020; and the one that the Episcopalian inmates specifically requested) and additional time slots for both choir (music) practice and their "Preacher-In-Training" class (similar to RCIA or billed.d.) Likewise, The Way faith (protestant) group was given Thursday nights, plus additional time slots for choir (music) practice and religious study, plus additional activity room time slots.

70) Alas, the Muslim/Islamic faith group was given Friday afternoons in the chapel — it is a Holy Obligation for Muslims to have their service on Friday afternoons in a way legally identical to Plaintiff Riggs and those to attend Church on Sundays.

71) Furthermore, upon information and belief, inmates de-clared Episcopalian, the Way, or Muslim were per-mitted at that time to attend chapel w/ inmates from other housing units, whereas Catholic and LDS inmates were not permitted.

72) At or around ~~March~~ February of 2023, inmates from various housing units were finally permitted to attend chapel together, with certain housing units being excluded.

73) Around that time, Davis declared, with the approval of Defendants, including but not limited to, Garrett and LeGrand, that inmates could no longer utilize electronic or musical equipment in the chapel for religious services for a month. Davis stated that the reason for this was to bring "focus" to religious "sermons," not religious music. Both the Catholic and LDS faith groups were subjected to this proscription, despite the centrality of music to Plaintiffs religions.

74) However, the Episcapalian, The Way, and the Muslim faith groups were not subjected to the music proscription.

75) In or around ~~Avant~~ February of 2023, Davis and LeGrand published memos to the inmate population establishing "call-out lists" for chapel services, allowing inmates to go to various services. However, inmates had to send a Kite requesting to be put on the call-out list for any given service. Those memos specifically stated that once an inmate was on a call-out list, he would <u>not</u> need to send subsequent Kites — he could continue to attend that service month-to-month, and only needed to send a new kite if he was moved to another housing unit.

76) Shortly thereafter, on or about 3/10/23, Davis
and LeGrand issued a vague memo regarding a changed
call-out list process for April 2023. Plaintiffs Riggs
and Harmer both read the memo and reasonably be-
lieved that they did not need to take any action,
as they were already signed up for their respective services.

77) On 3/21/23, Davis and LeGrand issued a new memo
"clarifying" the 3/10/23 memo, stating that inmates (All)
had had to re-Kite by 3/30/23 to attend
chapel services.

78) Plaintiffs Riggs and Harmer were both denied
access to chapel in April of 2023. Upon
information and belief, the attendance of Catholic
services went from about 40 inmates to about 4;
attendance of LDS services went from about 15
to about 1, sometimes zero. Both Plaintiffs Riggs
and Harmer thus missed Easter service in 2023
— Easter being the single most Holy Day of the
year for both Catholics and LDS adherents.

79) Upon information and belief, inmates belonging to
the Episcopalian, The Way, or Muslim faith groups,
who failed to turn in Kites in March 2023, were
not taken off the call-out list for April 2023;
the attendance rates of those services are the
same as before and after April 2023.

20.

90) Beginning in March of 2023, LDS services on only Monday nights were regularly cancelled. Specifically, LDS service was cancelled on the following dates: 3/20/23; 4/3/23; 4/17/23; 4/24/23; 5/1/23; 5/15/23; 6/5/23; 6/12/23; 6/19/23; 6/26/23; 8/7/23; 8/28/23; 9/18/23; 10/2/23; 10/9/23; 10/16/23; 10/23/23; 10/30/23 and 11/20/23. Between March and November of 2023, 19 weekly LDS services were cancelled; no LDS services took place for the entire months of June 2023 and October 2023; and no make-up services were offered. LDS services have been cancelled since November 2023, but with less frequency.

81) Upon information and belief, during the period of March through November of 2023, the Episcopalian service on Tuesday nights was cancelled once, and Davis and LeGrand made specific arrangements for a make-up service; and neither the Way on Thursday nights nor the Muslims on Friday afternoons suffered any cancellations.

82) Upon information and belief, On or around late 2023 and or early 2024, Davis and LeGrand again suspended use of musical and electronic equipment at chapel for a month — and again excepted the Episcopalian, The Way, and the Muslim faith groups from the proscription. Again this was done to exercise Davis's control of the content of, inter alia, the Catholic Mass and the LDS sacramental service.

21.

83) In or around March of 2024, Plaintiff Riggs, by and through a Catholic inmate facilitator at LCC, submitted a written request to have mass take place in the chapel on Easter Sunday — again the Holiest Day of the year for Catholics, including Riggs. Davis and LeGrand denied the request summarily because: "no chapel on Sundays".

84) Plaintiff Harmer submitted ~~requested~~ a similar written request for a Sunday Easter service, and was denied by Davis and LeGrand for the same reason.

85) In or about April of 2024, Plaintiff Riggs submitted a written request for Catholic mass to take place in the chapel on Pentecost Sunday — perhaps the third Holiest Day of the year for Catholics. that request was denied summarily by Davis and LeGrand because: "no chapel on Sundays."

                                      but not limited to,
86) In May of 2024, Defendants, including Breitenbach, LeGrand and Davis cancelled three Thursday Catholic services in a row: 5/2/24; 5/9/24; and 5/16/24. In 2024, Pentecost Sunday fell on or about 5/19/24; the Catholic faith group currently celebrates the Sunday mass of the week ahead — thus would have celebrated Pentecost on 5/16/24, but for the pre-planned cancellation by Breitenbach, LeGrand, Davis and others.

22.

37) Meanwhile, the Jewish Holy Day of Purim — upon information and belief, a relatively minor Jewish Holy Day — fell on<sup>or about</sup> 5/19/24, a <u>Saturday</u>. Breitenbach, LeGrand, Davis and others allowed a Jewish rabbi to come into the chapel to celebrate Purim with Jewish inmates on that day. Upon information and belief, this was allowed because the rabbi threatened legal action.

38) Currently, <u>Protestant</u> inmates are provided multiple services and study programs at LCC. The various Protestant faith groups are distinguished only nominally. There is a "general Christian" service on Monday afternoons, an Episcopalian services on Tuesday nights, Spanish-language general Christian services on Wednesday afternoons, "Protestant Christian" services on Thursday afternoons in an office area of the Chapel while the Catholic mass takes place, The Way (a Christian service) Thursday nights, Messianic Christian services on Friday afternoons, and various Protestant religious study and choir practice time slots. This list is not exhaustive either.

39) Meanwhile, Catholics and LDS get one day [illegible] a week, when services aren't cancelled, and no further considerations whatsoever. Plaintiffs Riggs and Harner filed prison grievances requesting time slots but were denied entirely, without any consideration for beliefs.

96) On or about April 25th, 2023, Plaintiff Harmer requested and was placed on the "common fare diet" — a religious diet designed to accommodate various religions: Jewish, Muslim, Buddhist, etc. The common fare diet consisted largely of fresh fruits and vegetables, whole grains such as quinoa, hard boiled eggs and other whole foods.

97) LDS adherents, including Plaintiff Harmer, adhere to specific dietary rules unique to the LDS faith. The specifics are detailed in the LDS Doctrines and Covenants (D&C) section 89 — the D&C is a canonical text on par with the Old and New Testaments of the Bible and the Book of Mormon. Following these dietary rules is an essential part of Plaintiff Harmer's religious practice, and requires him to abstain from alcohol, coffee, tobacco, and primarily eat a diet of ~~a variety of~~ whole grains, fresh fruits and vegetables, and eat meat in moderation — a diet adequately accommodated by common fare in April of 2023.

98) On or about October 9th, 2023, Defendants, including but not limited to, Druesedow, Garrett, LeGrand, Davis and Ellis changed the common fare to a menu consisting primarily of white bread and other highly processed foods — and almost completely devoid of a variety of whole grains, ~~~~ fresh fruits and vegetables. This prevented Plaintiff Harmer from meeting his religious dietary obligations

24.

93) Defendants, including but not limited to, Drucenda, Daniels, Garrett, Breitenbach, LeGrand and Davis prohibit Plaintiff Riggs and other Catholic inmates from receiving communion wine at mass.

94) Plaintiff Riggs asserts that the following are ^his sincerely held religious beliefs: that the Catholic Church is the One True Church; that he is subject to all religious requirements of non-incarcerated Catholics, including but not limited to, attending Catholic mass every Sunday and on the Holy Days of obligation that do not fall on Sunday; that attending mass on Thursdays does not satisfy his obligation to attend mass on Sundays and other Holy Days of obligation; that it ~~this is a~~ is his religious duty to both continually study the Catholic faith and to teach others (both members of the church and non-members) about the Catholic faith; that music during the liturgy is an essential part of Catholic mass; that he must receive Communion regularly; ~~and~~ that he must pray the Rosary regularly and communally, not merely in private in his prison cell; and to take the sacrament of penance (i.e. confession) regularly. This ~~list is not exhaustive~~

95) Plaintiff Harmer asserts that the following are his sincerely held religious beliefs: that the LDS Church is the true church of Jesus Christ and alone teaches the fullness of divine revelation; that he is subject to all religious requirements of non-incarcerated adherents

of the LDS faith; that it is his religious duty to attend Church on the Sabbath, and that the Sabbath is Sunday; that it is his religious duty to both continually study the LDS faith and to teach others (both members of the Church and non-members) about the LDS faith; that music is an essential part of the LDS liturgy; that he must meet and confer regularly with the LDS priesthood; and that it is a religious obligation to comply with the dietary requirements of D&C 89, as described in paragraph 91 herein. This list is not exhaustive.

96) Plaintiffs allege that each and every Defendant failed to consider or implement the least restrictive means when making each and every change to Catholic and LDS religious practice at LCC since 2018, as described above.

                                    each and every
97) Plaintiffs allege that Defendants had no compelling government interest in restricting Plaintiffs' religious exercises as described throughout this Complaint; which they had previously exercised prior to 2018 at LCC.

98) Plaintiffs allege that each and every Defendant substantially burdened their religious practice by not implementing less restrictive means where, hypothetically,
                                    interest
a compelling government existed, if at all, e.g. burdened the practices that had existed at LCC for decades for LDS and Catholics.

99) Plaintiffs assert each and every Defendant acted intentionally, and had actual and prior knowledge that their actions burdened Plaintiffs. In these and other similar means. 76.

100) Davis has refused to work with Catholic and LDS outside sponsors (clergy and lay church members), despite an affirmative obligation to do so, per ~~NDOC~~ the NDOC Religious Practice Manual (see same at section 5, subsection A, paragraph 4).

101) Davis's refusal to work with outside sponsors lead to an extended period of time upon information and belief over a year, between 2022 and 2023 in which LDS inmates could not obtain a copy of the Book of Mormon and other scriptural texts that are absolutely essential to their faith. Without those texts Plaintiff Harmer could not provide or receive religious instruction, nor truly congregate with other LDS inmates in a sacramental service setting.

102) At that same time, LDS outside sponsors were willing to donate the needed texts but Davis had not established communications with them; once the donations were eventually made, Davis took an unnecessarily long time to approve those texts.

103) Upon information and belief, when Catholic services are cancelled, Davis refuses to contact the Catholic outside sponsors in advance causing them to drive to the prison unnecessarily; those outside sponsors asked Davis to call during cancellations — Davis replied, "That's not my job," creating a substantial burden.

27.

# CLAIM 2

104) All prior paragraphs are hereby incorporated by reference.

105) Defendants violated and continue to violate Plaintiffs' constitutional right to the Free Exercise of Religion as guaranteed by the First Amendment.

106) These violations began in 2018 and are continuing presently.

107) NDOC operations are governed by Administrative Regulations (ARs). Chapel operations are governed by AR810: "Religious Faith Group Activities and Programs." Under the subhead "Responsibility," AR810 states: "The Deputy Director/Wardens/designees/Chaplains are responsible for the practice of Religious and Faith Group services in the Nevada Department of Correction's (NDOC)."

108) AR810.01(4) states: "All limitations or prohibitions must be consistent with consideration of whether the limitations or prohibitions is [sic "are"] in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling governmental interest, or as otherwise required by applicable law. Additionally, the Department shall consider whether the Regulation or purported restriction serves to "substantially burden" an inmate's ability to worship his or her religion."

109) Plaintiffs assert that all infringments of their constitutional rights by Defendants alleged in this Complaint are subject to the level of strict scrutiny articulated in AR810.01(4) under Nevada law.

110) On 9/5/24, Catholic mass at LCC was cancelled by Defendants including but not limited to Breitenbach, LeGrand, Davis and Dzurenda.

111) Upon information and belief, these same Defendants ordered prison guards to search the chapel; and during that search, one or more of the guards intentionally desicrated the Catholic alter pieces (which were stored in a locked cupboard) and intentionally placed the alter crucifix upside down — a known Satanic gesture — which was later discovered by a Catholic inmate/chapel clerk.

112) For purposes of brevity, Plaintiffs assert that each and every allegation articulated in Claim 1, above, also violates their First Amendment right to free exercise of religion.

113) Plaintiffs Upon information and belief, Defendants including but not limited to Dzurenda, Daniels, Wickham, Garrett, Breitenbach, LeGrand and Davis electronically eavesdrop and/or record confessions made by inmates to clergy and religious counselling between inmates and clergy, including confessions by Plaintiff Riggs and counseling from clergy to both Plaintiffs Riggs and Harmer.

29.

114) Plaintiffs allege that Defendant Davis has openly stated on several occasions that the reason the chapel is not open on Sundays is because he runs a church that has services on Sundays.

115) Prior to 2022 and/or 2023, the chapel operated, when necessary, without the presence of either the chaplain or a prison guard. Upon information and belief, the only documented "issue" at the chapel was sanctioned for not having his shirt tucked-in (this issue was discussed at length in the Episcopalian case; the name of the sanctioned inmate was redacted in discovery; however, Plaintiff Riggs received such a sanction in 2016 and believes that that reported issue is the same "issue" — furthermore, that issue was itself an attempt by prison officials to chill the free exercise of religion, and Riggs was targeted because he was a Catholic (facilitator).

116) The chapel at LCC has multiple surveillance cameras and is in the operations building — the chapel entrance is mere feet from central command head-quarters. LCC sergeants and lieutenants often watch cable TV (entertainment shows) on the same screens designated to monitor the chapel surveillance cameras while chapel services are taking place.

///

30.

117) Likewise, Defendants including but not limited to Garrett, Breitenbach, LeGrand and Davis only implemented pat-down procedures for inmates to enter the chapel — involving multiple officers and a metal detector — in early 2025.

118) Nowhere else at LCC are such procedures implemented, even though inmates at LCC are provided metal tools without supervision in a wide variety of job capacities; outside chapel.

119) Furthermore, Catholic inmates are subjected to more in-trusive searches than other inmates. Upon information and belief, Episcopalian inmates are rarely-if-ever searched.

120) Plaintiffs assert that none of the religious restrictions alleged in claims 1 and 2 of this Complaint are reasonably re-lated to a legitimate correctional purpose; and that each and every restriction creates a substantial burden on their religious exercise. These restrictions were im-posed by Defendants including but not limited to Drucenda, Garrett, Breitenbach, LeGrand and Davis.

121) Plaintiffs assert that Defendants could return the LCC chapel to the pre-2018 schedule at either no cost or at a de minimis cost. Further, plaintiffs have observed that Defendants acts against plaintiffs are not neutral, discriminatory and not reasonable, arbitrary and not rational in terms of any penological Interest.

31.

# CLAIM 3

122) All prior paragraphs are hereby incorporated by reference.

123) Defendants violated and continue to violate Plaintiffs' constitutional right that no religion shall be established as guaranteed by the First Amendment.

124) These violations began in 2018 and are continuing presently.

125) For purposes of brevity, Plaintiffs assert that each and every allegation articulated in Claims 1 and 2, above, also violate the Establishment Clause of the First Amendment.

126) Plaintiffs allege that all Defendants (except for Ellis) have established Protestant Christianity as the State religion for inmates at LCC.

127) Plaintiffs assert that neither the Catholic faith nor the LDS faith are compatable with Protestant beliefs.

128) Upon information and belief, all but one inmate chapel employee is Protestant; one is Catholic — and he was hired before Davis became chaplain; and Davis has been openly hostile to that one Catholic inmate-employee specifically due to his faith, often pointing at him and saying "because of you Catholics..."

129)   Protestant inmate chapel workers are allowed to work on their bible college study homework from their work computer during work hours; often grade the "bible college" homework of other inmates; use NDOC stationary and other resources at taxpayers expense; and are allowed time to practice on chapel musical instruments, and to perform music at multiple Protestant services.

130)   Defendant Davis received his religious education from the same bible college he facilitates for inmates. Upon information and belief, Davis works on post-graduate level work of his own from his office at LCC during work hours and on his work computer.

131)   Davis advertises the "bible college" to the inmate population via printed memos that are posted throughout the prison. LeGrand approves those memos. This is done at taxpayer expense. No other faith group has the opportunity to do the same (nor to use LCC resources to create such postings).

132)   Davis grades "bible college" homework from inmates during work hours, from his work office and computer. Davis uses LCC assets to promote bible college in a wide variety of ways.

133)   There is no Catholic or LDS bible college offered.

134)   Caseworkers at LCC encourage participation in the Bible College to demonstrate official program participation at LCC.

33.

135)    An orientation video, shown to all inmates who arrive at LCC, describes the "bible college" at length — Davis is interviewed by Caseworker Rutherford — and encourages inmates to sign up for "bible college."

136)    The Caseworkers do not encourage any other religious activity but the "bible college," nor does the orientation video mention whatsoever any other religious activity of other faith groups (LDS, catholic, etc.)

137)    When Catholic inmates complain to caseworkers that the current schedule (Thursday afternoons) conflicts with their work assignments, caseworkers encourage those inmates to "find another service" to attend, e.g. Protestant Services at night.

138)    The bible college curriculum specifically teaches that both Catholic doctrine and LDS doctrine are false.

139)    The Episcopalian faith group and The Way faith group are categorically Protestant. Each of those faith groups are given multiple chapel time slots and are able to have study groups, and choir practices. This is in addition to all the other Protestant services, their bible college, extra time to practice with musical instrumentals, etc., already afforded to Protestant inmates.

140)    ~~Plaintiff~~ ~~assert that all D.~~ When Defendant Davis first became chaplain at LCC, he held a meeting for

34.

all inmate faith-group facilitators. Plaintiff Riggs attended. Davis insisted the meeting begin with a prayer, which he led — praying in a Protestant Christian fashion. Not only were Catholics and LDS adherents in attendance, but also inmate facilitators of various non-Christian religions: Muslim, Jewish, Buddhist, various Native American and other pre-Christianity land-based religions etc. The message was clear: Protestant Christianity, as preached by Defendant Davis, was from that day forth the Established religion. Plaintiff Riggs and others, who had to attend the meeting to discuss important administrative matters regarding their respective faith groups, were compelled to submit to Davis's Protestant prayers in order to do so.

141) Since then, Davis has regularly and openly stated that his faith guides his decisions as chaplain.

142) Requests for accommodations that do not conform to Protestant doctrine are routine summarily denied. This is why the Catholic and LDS faith groups are not given a time slot to provide religious instruction — that instruction doesn't teach Protestant doctrine.

143) All other Defendants (except for Ellis) have actively embraced the Establishment of Protestantism and have actual knowledge of the facts alleged herein. There are many additional unpled facts to support this claim.

35

# CLAIM 4

144)  All prior paragraphs are hereby incorporated by reference.

145)  Defendants violated and continue to violate Plaintiff's constitutional right to the Equala Protection of Law as guaranteed by the Fourteenth Amendment.

146)  These violations began in 2018 and are continuing presently.

147)  For purposes of brevity, Plaintiffs assert that each and every allegation articulated in Claims 1, 2 and 3, above, also violate the Equal Protection Clause of the Fourteenth Amendment.

148)  Plaintiffs allege that all Defendants ~~named the Miller~~ named in this action have treated Plaintiffs unequally to similarly situated inmates who happen to be Protestant rather than Catholic or LDS.

149)  Upon information and belief: LCC houses about 1,500 inmates; about 300 - 400 of which are formally declared Catholic (prison officials ask one's religious affiliation upon intakem into the NDOC); prior to Sunday services being cancelled, the Catholic mass U regularly had 70 - 80 inmates in attendance; currently, 30 - 40 inmates regularly attend the Thursday Catholic service; the number of declared LDS inmates is unknown, but about 20 inmates regularly attend the Monday night service.

150)    Both faith groups have "outside sponsors" – clergy and lay volunteers – who attend and/or conduct the Catholic and LDS services.

151)    Plaintiffs assert that chapel time slots and other resources are not allotted in a neutral manner. Catholics, (187) including plaintiff Riggs cannot obtain paying job assignments and also go to Mass

152)    In addition to the slew of Protestant services available, the Episcopalian faith group gets three distinct time slots: one for their service proper; one for Preacher-In-Training (a study group similar to Catholic RCIA and LDS bible study); and one for choir practice. Furthermore, the Episcopalian group was able to choose the specific day and time of their services – Tuesday evenings. Episcopalian inmates are able to get assigned paid positions, e.g. prison industries.

153)    Plaintiffs brought their issues to Defendants attention by way of the prison grievance system, and requested that Catholic and LDS faith groups be provided these three basic time slots, as equal to the Episcopalians, but that request was denied by Defendants at all grievance stages.

154)    The Way faith group also receives multiple time slots for service proper, bible study and choir practice, and was able to choose the specific day and time of their services.

155)    Alas, the Islamic/Muslim faith group is allowed to have their services on their chosen day and time – Friday afternoons.

156)     With regards to the common fare menu Defendants took measures to ensure that the new common fare menu "meet(s) or exceed(s) Kosher Orthodox Union Standards" as per AR 814.02 (7) and had the menu approved by a rabbi (identified in one grievance response by Breitenbach as "Rabbi Felling"). However, Defendants did not confer with any LDS religious authority to ensure that the new menu would conform with Plaintiff Harmer's — or any LDS adherant's — religious diet.

157)     Plaintiffs assert that all Defendants — especially Garrett, Breitenbach, LeGrand and Davis — did not make a good faith effort to treat the Catholic and LDS religious groups equally.

158)     Regarding the state-sponsored "bible college" Defendants Garrett, Breitenbach, LeGrand and Davis, who facilitate that program, do not provide or facilitate any sort of religious study or bible college for either Catholic or LDS inmates — even though, upon information and belief, religious study programs that are logistically very similar to the state bible college exist and are available to prisoners generally — Defendants simply refuse to expend the effort to facilitate those programs. Indeed, those same Defendants refuse to even make photocopies of sheet music, etc., for the Catholic and LDS groups

# CLAIM 5

159)    All prior paragraphs are hereby incorporated by reference.

160)    All Defendants named in this Complaint except Ellis formed and/or joined a Shadow Government and conspired to violate Plaintiffs' civil rights.

161)    This conspiracy began in 2018 and continues presently.

162)    For purposes of brevity, Plaintiffs assert that each and every allegation articulated in Claims 1, 2, 3 and 4, above, and each and every assertion made therein, support the instant claim of conspiracy.

163)    Each and every Defendant except Ellis acted in concert with and/or had a meeting of the minds with at least one other Defendant with the goals of taking away Catholic and LDS services in violation of RLUIPA; of preventing Plaintiffs from freely exercising their respective religions; of establishing Protestantism as the State religion at LCC; and of ensuring that Plaintiffs, due to their religious affiliations did not receive equal protection and/or treatment as similarly-situated inmates at LCC who happen to be Protestant rather than Catholic or LDS. Defendants specifically formed the Shadow Government for this purpose.                39.

164)     Upon information and belief, un-indicted co-conspirators Renee Baker (formerly Warden of LCC) and Tara Carpenter (formerly Associate Warden of Programming at LCC) formed the Shadow Government at LCC under the direction of Dzurenda.

165)     Baker and Carpenter used the Shadow Government to force out Davis's predecessor (the former chaplain of LCC) from his job at LCC by way of harassment and implied threats, relayed by Shadow Government operatives and henchmen. This was about 2018.

166)     After constructively terminating the former chaplain, Baker and Carpenter hired Davis solely for the true purpose of executing the Shadow Government's directives, as described above. This is demonstrated, inter alia, by the facts that: 1) Davis was not qualified to be hired as Chaplain at LCC (he has no accredited religious education nor any other relevant qualifications); and 2) at least two qualified applicants applied for the job.

167)     Dzurenda endorsed the hiring of Davis. Under state tort law, merely hiring Davis despite his lack of qual-ifications would constitute the tort of negligent hiring and/or retention. However, Dzurenda wasn't merely negligent; he knew Davis lacked requisite qualifications. Furthermore, Dzurenda ⬧ allowed Davis to be hired,

and to be retained thereafter, specifically to act as
a shadow government operative. (i.e. sub-lieutenant) Notably, Dzurenda
retained Davis even after the resolution of the
Episcopalian and Muslim cases, and throughout the
ongoing civil rights violations Davis has committed and
commits still against Catholic and LDS inmates —
which was brought to his attention by way of Plaintiffs'
prison grievances, notwithstanding his own directives.

167) In 2019, LeGrand was a caseworker at LCC who rose
to the position of Associate Warden of programming. Le-
Grand also replaced Carpenter's position in the Shadow
Government — indeed, Dzurenda and the Shadow Government
utilize promotions within the NDOC as an incentive to
carry out Shadow Government directives.

168) LeGrand literally co-signed each act of Davis as alleged
herein. Upon information and belief, LeGrand, a former
attorney, acted as Shadow Government lieutenant and
oversaw Davis's misconduct and was directly responsible
for many of the alleged religious service cancellations
and other civil rights violations as alleged herein. Davis
and LeGrand communicated via E-mail and/other means.

170) Dzurenda retained LeGrand even after the Episcopalian
case was resolved, despite the simultaneous and continuing
civil rights violations alleged in this Complaint. The

41

choice to retain LeGrand was not negligent, or even merely deliberately indifferent, but was specifically made by Druccoda to further the Shadow Government's interests and to reward LeGrand for her labors on behalf of and within the Shadow Government.

171)   Tim Garrett is the former warden of LCC and was employed as such during the bulk of the civil rights violations alleged in this Complaint. Garrett, who was formerly a lieutenant and then associate warden at LCC, received the job of warden so that he could act as a sub-boss in the Shadow Government — Garrett's function was to ensure that LeGrand and Davis could carry out Shadow Government directives without hinderance, whereas a warden not employed by the Shadow Government would have intervened to discontinue the civil rights violations alleged in this Complaint.

172)   Breitenbach is the current Warden of LCC and a sub-boss in the Shadow Government. Breitenbach has, since the beginning of her employment at LCC, and continues, to ensure that LeGrand and Davis can carry out Shadow Government directives without hinderance. Indeed, Druccoda promoted Breitenbach from a lesser position at another Nevada prison to warden of LCC specifically for this purpose.

173)   Daniels is the former Director of the NDOC. Daniels

42.

who became director after Drwenda left the job around 2020, assumed Drwenda's role as Boss of the Shadow Government at the same time and saw furthered the Shadow Government's directives in the same manner as had Drwenda before him. When Daniels left the NDoc around 2022, Drwenda resumed his employment as Director of NDoc and as Boss of the Shadow Government.

174) Doe deputy directors of NDOC acted and continue to act as advisors and counselors within the Shadow Government. Deputy Directors reviewed the final level of Plaintiffs' prison grievances; review prison policies, operations and programs; and are charged with remedying civil rights violations such as those alleged by way of this complaint. Rather than actually remedy said civil rights violations, these deputy directors advised and counseled Drwenda as Boss regarding how to further advance Shadow Government objectives and avoid Federal oversight or other hinderances.

175) Uniformed correctional officers at LCC are employed as henchmen within the Shadow Government and, otherunder the color of law, intimidate Plaintiffs and similarly situated inmates from exercising their constitutional rights. The Shadow Government henchmen currently known to Plaintiffs are lts Preston, Clark and Harroun; Sgts Martin and Gentry; SC/Os (senior correctional officers)

43.

Govea, Etcheberry, Wilcoxen and Hensley, and former
C/O Martinez — who, upon information and belief, was
terminated from NDOC employment after he was subjected
to a felony arrest for actions outside of the prison.

176)  Since 2022, these henchmen have affected an
overwhelming show of force at chapel services — esp-
ecially at Catholic services. Three, four or even five
officers search inmates going into Catholic mass, search
through Bibles and religious texts, disrespectfully handle
inmates' Rosary beads, etc. These searches include metal
detectors and intrusive pat-down searches, all done
under the direct supervison of Davis. These hench-
men often curse at the inmates — for example,
"Fuck you," "Stand on the fucking wall," "shut
the fuck up," "move to the other side of the
fucking hall," "don't be a bitch — go home and
pray your fucking rosary," etc. — as they enter
the chapel. At one point, Wilcoxen asked one
Catholic inmate: "Why do Christian girls love
Jesus?" Then Wilcoxen spread his arms pantomiming
a crucifixion and said: "because He was hung like
this."

177)  Nowhere else at LCC are such security measures
taken, and there is no legitimate penalogical interest
for them at LCC the purpose is to chill plaintiffs'
and similar similarly situated inmates' civil rights

178)   Those intrusive searches are ordered by LeGrand and/or
Breitenbach who have a regular meeting of the minds and
act in concert to issue those orders; those orders are
part of the directives set by Drucanda and not as advised
and counseled by the Does 1-5 deputy directors.

179)   Indeed, each and every civil rights violation alleged
in this Complaint — RLUIPA; 1st Amendment Free Exer-
cise and Establishment; and 14th Amendment Equal
Protection — were discussed by all members of the
Shadow Government. For purposes of brevity, those claims
are not reprinted here, but rather are incorporated by reference.

180)   Plaintiffs assert that each and every constitutional
tort and RLUIPA violation alleged herein was motivated
by a class-based, individiously discriminatory animus
on the part of the conspirators towards inmates
who belong to either the Catholic Church or the
LDS Church, and towards inmates considering join-
ing either Church.

181)   As a result of the conspirators' animus-based action,
attendance at Catholic and LDS services has dropped,
and Plaintiffs cannot provide formal religious instruction
to would-be new members of either Church, despite their
religious obligations to do so. As a result, their
has not been a Catholic baptism at LCC since May
of 2019, even though inmates have desire to be baptized

9691   UC

192)   Alas, Plaintiffs assert that each and every conspirator named in this Complaint conspired to commit these civil rights violations for the purpose of depriving Plaintiffs and other Catholic and/or LDS inmates of the equal protections of laws, or of equal privileges and immunities under the laws.

## G. PREVIOUS LAWSUITS

193)   Plaintiff Riggs has filed other lawsuits while incarcerated.

194)   Plaintiff Haimer has not filed any other lawsuits while incarcerated.

185).   Neither Plaintiff has ever been designated by this Court or any other court as subject to "three strikes" under 28 U.S.C. § 1915(g).

## H. REQUEST FOR RELIEF

Wherefore, Plaintiffs individually and as representatives of similarly-situated Catholic and/or LDS inmates at LCC seek the following relief:

1. That permanent injunctive relief be granted as against Defendants to relieve the burdens imposed by Defendants relating to Plaintiffs' specified religious practices, including but not limited to the following:

a. The full restoration of Catholic Mass and LDS Sacramental services on Sundays;

b. The full restoration of all Catholic and LDS Holy Days as articulated in Claim I and/or found in AR 810 to take place on the actual day;

c. The full restoration of weekly Catholic choir practice, and the full restoration of weekly LDS choir practice — each of which to be scheduled for at least 75 minutes; and for Catholic and LDS inmates who are not in either choir to be permitted to attend the respective choir practices, which are to take place in the chapel, and use chapel space to take part in ancillary religious practices that do not interfere with the choir practices (i.e. group Rosary and other group prayer, confessions and counseling with clergy, unction, fellowship, etc.)

d. The full restoration of weekly Catholic RCIA and LDS Bible Study (with leave for LDS facilitator to change title of Bible Study), of each of which to take place in chapel (the chapel contains a separate, small study area to which Plaintiffs do not object for purposes of RCIA and Bible Study) for at least 75 minutes;

e. The full restoration of a proper Common Fare Diet
that meets the religious dietary needs of Plaintiff
Harmer and similarly-situated inmates;

f. Catholic inmates including Plaintiff Riggs be per-
mitted to receive Eucharistic Wine at Catholic
Mass at the discretion of Church clergy (Riggs
anticipates that Eucharistic Wine will be rarely
be served to inmates — perhaps at baptisms and/or
Easter, Pentecost, and Christmas — and asserts
that the quantity of wine and the alcoholic
level thereof is de minimus);

g. The allowance of donations from LDS and/or
Catholic organizations of supplies, media and music
equipment, literature, and similar items;

h. That Defendants be required to timely train out-
side sponsors and provide timely access to in-
mates, and to provide local training in Lovelock
(or at LCC) to outside sponsors at a time suit-
able to both professional (i.e full-time) clergy
and lay ministers (at present, training is offered
at 7am on weekdays — in Carson City);

i. That Defendants, with the assistance of LDS
and/or Catholic outside sponsors, facilitate
LDS and Catholic bible college programs;

48

and that Defendants expend and provide equal
access to LCC resources (including Defendants'
work hours) as currently provided to the "LCC
Bible College"; and that Defendants be pre-
vented from cancelling the current LCC Bible
College, as same would result in further RLUIPA
violations and potential harm to Plaintiffs;

j. That Defendants cease pat-downs and metal
detection scans outside the chapel as there
is no support or evidence of risk of harm
greater at the chapel than at any other
gathering areas of LCC, where such pat-downs
and scans are not conducted.

K. That no audio listening or recording shall be done
by Defendants or any prison officials of any
private inmate-clergy meeting, including but not
limited to Catholic confessions, religious counseling,
etc.

l. That call-out lists not be used to delay
inmate attendance of religious services be-
yond 48 hours after a request is received;

m. That Davis and/or any future chaplain call
outside sponsors as soon as he learns of any

49.

chapel service that the outside sponsors attend
is to be cancelled;

n. That Defendants be prohibited from controlling
the content of Catholic and/or LDS services
in any way, as long as Plaintiffs' activities
have a rational relationship with expressed re-
ligious objectives, including how LDS and Catholic
time slots in chapel are used, and including use
of musical instruments and equipment used in a
standard fashion;

o. That, once Catholic and LDS chapel schedules
are established, Defendants be required to honor
same and, in rare cancellations, make-up services
be provided;

p. That should either or both Plaintiffs be released
from incarceration, they may appoint successors-
in-interest to all aspects of this action
except for money damages;

q. For judicial monitoring of Defendants for three
years to assure compliance with RLUIPA and
any orders issued by the Court;

///

50.

1. For a Court referral to the U.S. Dept. of Justice for a review of necessity of forfeiture of federal funds by Defendants from 2018 to judgment for systemic and continuing RLUIPA violations;

2. For an award of attorney fees and costs as allowed by law;

3. For an award of court costs and fees as allowed by law;

4. For declaratory relief for all claims;

5. For Claims 2, 3, 4 and 5, Plaintiffs seek compensation and injunctive relief as follows:

a. For permanent injunctive relief, in addition to that sought above, as this Court deems necessary to address the harm detailed throughout this Complaint, which may include the Court sending U.S. Marshalls to supervise the LCC chapel and appointing a special master to act as Chaplain;

b. nominal damages to Plaintiffs;

c. For an award of compensatory damages in an

51.

amount in excess of $75,000 per Plaintiff;

d. For punitive damages against Defendants in an amount to be determined at trial for the intentional, malicious and deliberate acts of Defendants that harmed Plaintiffs and similarly-situated Catholic and LDS inmates;

e. For post-judgment interest on any award of compensatory and/or punitive damages; and

6. Any other relief this Court deems appropriate.

I understand that a false statement or answer to any question in this complaint will subject me to penalties of perjury. I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT. See 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Daniel Riggs
Plaintiff in pro se
Dated: 9/30/24

Bryan Harmer
Plaintiff in pro se
Dated: 9/30/24